## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

SUSAN L. SANTILLO,

               Plaintiff,

-vs-                                       Case No.   2:10-cv-70-FtM-29SPC

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This matter comes before the Court on the Plaintiff's Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. #1) filed on February 3, 2010, in the Middle District of Florida, Fort Myers Division.   The Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #12) on June 21, 2010.   The Commissioner filed the Memorandum in Support of the Commissioner's Decision (Doc. #14) on August 20, 2010.   Thus, the Motion is now ripe for review.   This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 42 U.S.C. § 405(g).

      The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (hereinafter ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

# FACTS

## *Procedural History*

On February 12, 2007, the Plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for Supplemental Security Income, alleging, in both applications, an onset disability date of February 23, 2006. (Tr. 10). These claims were denied initially on June 12, 2007, and again upon reconsideration on October 10, 2007. (Tr. 10). Thereafter, the Plaintiff timely filed a written Request for Hearing on November 9, 2007. (Tr. 10). On July 22, 2009, a hearing was held by video before the Honorable Ruben Rivera, Jr., the ALJ, in West Palm Beach, Florida. The Plaintiff appeared in Fort Myers, Florida. (Tr. 10). The ALJ issued an unfavorable decision on August 27, 2009. (Tr. 10–22). The Plaintiff filed a Request for Review with the Appeals Council. (Tr. 5–6). The Appeals Council denied the Plaintiff's Request for Review on January 6, 2010. (Tr. 1–4). The Plaintiff has exhausted her administrative remedies, and this case is ripe for review under 42 U.S.C. § 405(g). Jonas Kushner, an attorney, represents the Plaintiff.

## *Plaintiff's History*

The Plaintiff was fifty-four (54) years old, born on July 21, 1954, when the hearing decision was issued. (Tr. 10, 21). The Plaintiff has a high school education and training as a certified nursing assistant (hereinafter CNA). The Plaintiff's past relevant work included a position as a CNA and a home health aid. She said that she was limited in her ability to work due to spina bifida with pain caused by prolonged standing and walking, and fibromyalgia. (Tr. 16). The Plaintiff stopped working in February 2006 when she was laid off due to the decision of her client's children to hire another agency for healthcare needs. (Tr. 12). The Plaintiff did not return to work

and collected unemployment benefits for six months. (Tr. 31–32).   The Plaintiff alleges an onset disability date of February 23, 2006, due to problems with her knee, back, neck, and legs.   (Tr. 31–33, 35).

<u>*Medical History*</u>

The medical reports of record begin in June 2002 with a report from Dr. Cook, an orthopedic physician.   The Plaintiff complained of pain going down both legs and in the left arm. Dr. Cook noted she had surgery in 2001 for her lungs.   The Plaintiff has mitral valve prolapse and a long-standing spina bifida problem, which she has had since childhood, and she had a tendon transfer on the left.   During a physical exam, Dr. Cook discovered some atrophy in the left lower extremity consistent with her spina bifida.   Dr. Cook reviewed recent x-rays of the Plaintiff's cervical spine, thoracic spine, and lumbar spine, which were consistent with dysplasia.   He stated that he was concerned over an atypical cervical myelopathy or an MS or other issue; her symptoms were progressing and getting worse.   He recommended a MRI of the cervical and lumbar spine. (Tr. 189).

In July 2002, Dr. Cook noted continued complaints of generalized aches and pains with paresthesias and back pain with numbness down both legs.   The cervical MRI showed moderate degenerative disease; the lumbar MRI indicated that the Plaintiff probably has a diastematomyeli with tethering of the cord and a number of anomalies with a very large capacious dural sac, splitting of the cauda equine, and the rejoining of the nerve roots and some clumping at L5/S1, all of which appeared to be anomalus.   She was to see Dr. Busano for a workup for intrinsic neurologic disease, as her symptoms may well be an MS or other issues.   Dr. Cook said a

-3-

neurosurgeon evaluation may be necessary to see if she had a true tethering that might be released surgically. (Tr. 190).

In January 2003, the Plaintiff was charged with DWI and admitted to UMG-Psychiatry. She treated from January 2003 to July 2003 with Dr. Kaufman. Medications were Celexa, Buspar and Klonopin. In February 2003, she said she had increased pain; she had pain in the ankles, knees, wrist, numbness from the knees, legs.   She said she was not satisfied that "QOL" will be coming to an end at age 48.   She described bizarre situations. (Tr. 197).

In April 2003, Plaintiff told her treating doctors that she had recently had a trip to France/England and had significant pleasure although her leg pains were excruciating.   She said that she does not sleep for days and then will just pass out. (Tr. 195).

In June 2003, the Plaintiff told her treating doctor that she had unbearable leg pain.   It was at the point where it was difficult to walk. (Tr. 193).   Her treating psychiatric doctor noted that in June 2003 MRIs of the cervical spine showed fused vertebrae at C2/C3, C6/C7; severe disc and end plate degeneration with osteophytes at C5/C6; central spinal stenosis but no cord compression at C5/C6; MRI of the lumbar spine showed possible tethered cord which ends at L3/L4, evidence of separation of the conus into two discrete segments and fusion of the segments at L3.   Also, there were abnormal vertebral bodies at L2 and L3. (Tr. 193).

In July 2003, the Plaintiff said her pain was markedly worsening.   The Plaintiff had many multiple pain points consistent with fibromyalgia.   She was seeing Dr. Lichtbraun for her fibromyalgia. (Tr. 192).

In March 2005 the Plaintiff saw Dr. Kagan, who noted she had sustained injuries to her right knee in a slip and fall accident at Wal-Mart on January 16, 2005.   The Plaintiff had her knee

aspirated and injected and that helped, but now she was complaining of burning, recurring pain that increased and was severe at night.   MRI of the right knee showed a tear on the posterior horn and body of the medial meniscus and a tear at the lateral meniscus with chondromalacia and osteoarthritic change.   Dr. Kagan said the Plaintiff would likely be a candidate for a knee replacement.   He said the Plaintiff had some underlying osteoarthritis and then aggravated the knee and now was in terrible pain. (Tr. 205–06).

In October 2005, the Plaintiff told her doctor that she started to have some burning in the knee that tracks down the back of her leg and her calf.   If the Plaintiff rests the leg, the pain subsides.   She described her pain as burning, aching, constant, and increasing with exercise and at night.   Diagnosis was right knee osteoarthritis, right knee medial meniscal tear and lateral meniscal tear.   Again they discussed that the Plaintiff was a candidate for total knee replacement. Now her symptoms were bothering her on a daily basis and affected her activities of daily living and her exercise so she was considering the surgery.   The Plaintiff had an injection into the right knee. (Tr. 202–03).

The Plaintiff also treated at Physicians Primary Care, the records from which show that the Plaintiff was seen for routine health care beginning June 13, 2005.   That June, Dr. Lottridge noted the Plaintiff said she had chronic pain, which was worsening, and she was working more. Plaintiff said her hypertension was running high.   Past medical history included backache, mitral valve prolapse, fibromyalgia, chronic pain—spina bifida with chronic pain.   The Plaintiff was unable to go to pain management due to lack of insurance. (Tr. 253–54).

In August 2005, Plaintiff saw Dr. Drake at the same clinic.   The Plaintiff said she had a history of chronic pain syndrome and fibromyalgia, which the doctor described as moderate and

gave her medication samples.  She now complained of recurring breast pain and high blood pressure. (Tr. 249–51).

In September 2005, Plaintiff saw Dr. Drake again for neck pain and neck stiffness, and also cervical pain, lumbar pain, thoracic pain, anxiety and insomnia.   The Plaintiff was continued on Elavil for her anxiety and depression, and also Zocor, amitriptyline. (Tr. 236–48).

Dr. Drake referred Plaintiff to Dr. Free at Advanced Pain Management Specialists.   On March 20, 2006, the Plaintiff saw Dr. Free regarding her axial spinal pain and fibromyalgia.   The report notes the Plaintiff's history of chronic pain, mitral valve prolapse, and depression, and her left ankle tendon lengthening and various orthopedic surgeries as a child.   MRI showed low-lying tethered cord ending at L3/4 with evidence of separation of the cordis into two segments, then fusion of those two elements at L3 consistent with diastematomyelia.   MRI of the cervical spine showed fused vertebral bodies at C2/3 and C6/7 and severe disc and end-plate degeneration at C5/6 with osteophytes and canal stenosis.   Physical examination indicated her gait was not antalgic, and she had no pain over her cervical, thoracic or lumbar spinous processes.   She had tenderness to palpation along all of her axial paraspinal musculature and presented with generalized myofascial pain.   She had no focal motor or sensory deficits. Impressions were of chronic axial spinal pain, diastematomyelia, cervical and lumbar degenerative disc disease, depression, and opiate dependence. (Tr. 436–38).

In June 2006 the Plaintiff returned to Dr. Drake, complaining of chronic pain from her spina bifida but was unable to go to pain management due to lack of insurance.   The Plaintiff was continued on the oxycodone and percocet. (Tr. 236).   In June, she was seen at Physicians Primary Care for an itching rash. Plaintiff said she also was fatigued for weeks and had depression and

myalgia.   The Plaintiff was assessed with insomnia (prescribed Ambien); fibromyalgia stable, chronic pain from spina bifida, hypertension (prescribed hyzear), dermatophytosis of the body (prescribed Ketoconazole cream), anxiety, depression (refill Xanax), malaise, and fatigue. (Tr. 231–33).

The Plaintiff had an Independent Medical Evaluation with Orthopedic Specialists of Florida on June 14, 2006, for evaluation of her right knee.   Dr. Schwartz, M.D. noted the Plaintiff walked with antalgic gait and seemed to have some problems with the bilateral lower extremities. Based on review of a February 2005 MRI and physical examination, Dr. Schwartz reported that she had pre-existing arthritis in the knee, although it was asymptomatic, but she also had a new injury to the right knee—a meniscal tear.   Knee replacement was a viable option since she had arthritis and pain in the knee, but he felt that a knee arthroscopy would treat the problem occurring from the Plaintiff's fall, which was likely the cause of the meniscal tear.   He also suggested injections. (Tr. 259–60).

Later in August 2006, the Plaintiff saw Dr. Drake for sudden onset of anxiety, occurring in an intermittent pattern.   It was characterized as extreme fear.   Her fibromyalgia was described as moderate, and the Plaintiff was diagnosed with knee pain, insomnia, and allergies.   The plan was to schedule another knee injection. (Tr. 228–30).

On August 14, 2006, the Plaintiff was seen at Lee Memorial Health System for back pain with no obvious trauma.   She said her symptoms were worse with movement and twisting.   On exam, the Plaintiff had tenderness in the lower mid-scapular area.   She was given Vicodin, Soma and Prilosec for impression of mid-scapular pain of unclear etiology and told to follow-up with her primary care physician. (Tr. 360).

Progress notes from Primary Care on September 6, 2006, state that the Plaintiff was rechecked for right knee pain, which she reported as moderate.   There was no use of an assistive device. Her orthopedic surgeon offered knee replacement, but the Plaintiff declined, preferring injections as an alternative. (Tr. 225−26).   On October 10, 2006, the Plaintiff was again seen for her right knee pain, which occurred with palpation and movement.   Her knee joint was aspirated and injected. (Tr. 222).   Dr. Christine Mackie, a treating physician, noted that a call from Dr. Free indicated the Plaintiff had been treated for pain. The Plaintiff's urine drug screen was positive for methadone, cocaine, and oxycodone, and Dr. Free would no longer prescribe pain medications. (Tr. 224).

In January 2007, the Plaintiff was seen again for her knee pain; she was injected again and was prescribed Ultram for the pain.   Also, she was prescribed meloprolol succinate for hypertension; Klonopin for anxiety. (Tr. 218−19.)

On January 13, 2007, the Plaintiff was seen at Lee Memorial Health System with acute exacerbation of right knee pain. She said she was going out-of-town and wanted some pain medication for her knee prior to going.   She was prescribed Darvocet and Lodine.   She was advised to follow-up with her treating physician, Dr. Shwartz, which she did on January 22, 2007, for another knee injection. (Tr. 259−60, 358−59).

On April 27, 2007 Orthopedic Specialists completed a form indicating that the Plaintiff had no deficits to the right leg.   The Plaintiff's right leg had 5/5 muscle strength and was mildly antalgic.   She could squat, though it was not advised, walk on toes and heels, and an assistive device was not medically necessary for ambulation.   Crutches, however, could be used if needed, but, again, were not medically necessary. (Tr. 265).

On May 30, 2007, the Plaintiff was examined by Dr. Claudia Zsigmond, a consultative examiner, upon referral of the office of Disability Determinations.   The Plaintiff reported a history of depression, beginning in 1999 when her mother committed suicide.   Her depression had been managed with Celexa, but, for the six months prior, she had been unable to afford the medication.   The Plaintiff said she had depressed mood, daily crying episodes, anhedonia, lack of social interactions, and frustration and helplessness.   She noted a history of suicidal ideation with attempt in 2001.   Dr. Zsigmond indicated the Plaintiff had a depressed and tearful effect and appeared in moderate mental distress and said Plaintiff's prognosis was poor due to untreated mental illness.   Nevertheless, she reported a history of good relationships with coworkers and supervisors.   The Plaintiff admitted to a history of alcohol dependence from 1991 to 2001, but had not consumed alcohol since 2001 and reported no use of illicit drugs.   She lived alone, but was financially supported by her sister and stated she had no health insurance. (Tr. 267–69).

 The Plaintiff stated that she left her job when the client's children decided to have another agency handle the client's healthcare needs; however, she made no attempts to return to work since she collected unemployment.   Dr. Zsigmond indicated the Plaintiff had good basic functioning and hygiene and was 5'4" tall, weighing 250 pounds.   She had no prominent gait abnormalities or gross motor coordination problems.   Mental status indicated she was alert and well oriented, with no symptoms of psychosis.   She had good recall of recent and remote events, suggesting no severe short-term or long-term memory impairment.   Her speech and thought processes were logical and coherent. She was able to initiate and maintain friendships, and her average day consisted of watching television and light housecleaning.   She drove on a limited basis due to her knee pain.   Also, her sleep was disrupted by pain, and she averaged about 4–5 hours of uninterrupted sleep a

night.   Dr. Zsigmon said activities of daily living were appropriate but slow and painful.   The Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; alcohol dependence, in sustained full remission; Plaintiff was assigned a GAF of 55, indicating moderate symptoms. (Tr. 267-269).

In June 2007, Dr. Sharmistha Desai, a file-reviewing physician, completed a Physical Residual Functional Capacity ("RFC") form at the request of SSA.   Dr. Desai wrote that the Plaintiff's primary diagnosis was "OA-RT knee;" secondary diagnosis was spina bifida and other alleged impairments were fibromyalgia and obesity.   In reviewing the medical evidence, the medical consultant found that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours and sit for about 6 hours in an 8-hour workday.   The Plaintiff could only occasionally climb ramps and stairs, balance, stoop, and crouch, but could never climb ladders or ropes, kneel, or crawl.   Dr. Desai also indicated that the Plaintiff should avoid concentrated exposure to extreme cold, humidity, vibration, and hazards.   Lastly, the physician found no manipulative, visual or communicative limitations. (Tr. 316–23).

On June 12, 2007, a Psychiatric Review Technique Form ("PRT") was completed by Arlene Sumner.   There is no indication this person is a medical professional.   She wrote that Plaintiff had osteoarthritis of the right knee, fibromyalgia, and history of spina bifida; and checked that Plaintiff could lift 20 pounds occasionally, lift 10 pounds frequently; sit for about 6 hours, and stand and/or walk for about 6 hours in an 8 hour work day. (Tr. 284).   She also checked that Plaintiff was limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 284–91).

On July 11, 2007, Plaintiff returned to Orthopedic Specialists, whereupon Dr. Schwartz diagnosed her with right knee osteoarthritis, cervical spinal stenosis, lumbar spinal stenosis, and spina bifida.   She did not appear to have acute myelopathy.   The doctor indicated that she should be evaluated for her neck and back.   The Plaintiff still was having right knee pain and seemed to have worsening neck and back pain; she had limited range of motion of the neck with some signs of radicular symptoms and shooting pain down the left arm.   X-rays of the right knee showed significant tricompartmental arthritic change, and the range of motion of the knee was limited. The physician said Plaintiff may be a candidate for viscosupplementation or knee replacement. Plaintiff needed to be evaluated for her neck.   Further, Dr. Schwartz stated that the Plaintiff would make an appointment after trying to get her funding worked out and disability set up. (Tr. 296).

Plaintiff started treating with psychiatrist Dr. Raymond Johnson on July 16, 2007, and continued treatment for outpatient mental health care until October 2008.   During this time, her recent and remote memory was unimpaired, her conceptual disorganization was of a negligible degree and there were no significant preoccupations in her thought content.   She denied hallucinations, her attitude was cooperative, judgment was good, and her attention and concentration was such that she was able to attend and maintain focus. She was able to resist urges. Her July 2007 diagnoses were major depressive disorder, recurrent, and severe without psychotic features, and the Plaintiff reported she had been drinking intermittently due to depression. (Tr. 298–300).

The Plaintiff saw treating physician, Dr. Strausbaugh, D.O., for routine health care from July 20, 2007, through June 19, 2009. He diagnosed cervical radiculopathy and chest pain and prescribed pain medication. (Tr. 372).

11

In August 2007, Plaintiff returned to Lee Memorial Health System for left ankle pain and swelling for the past week after a slip and fall.   Her medications were Celexa, Metoprolol, and Klonopin.   There had been soft tissue swelling in the ankle and chronic deformity of the foot with limited range of motion secondary to her past orthopedic correction of her heel cord.   Gait was antalgic.   An x-ray of the ankle was negative, and she was diagnosed with left ankle strain.   The Plaintiff was prescribed Percocet and given crutches. (Tr. 356–57).   In August 2007, Dr. Strausbaugh noted the sprained left ankle. (Tr. 371).

On September 6, 2007, the Plaintiff saw Dr. Milcovic, M.D., at Lee Pain Services for a consultative examination in regard to her complaints of chronic pain.   She said that she had pain for most of her life and had congenital spina bifida that was operated on as a child.   She did quite well and function-wise was a fully functioning individual for all these years.   She had taken multiple narcotics, none of which helped to relieve her pain significantly, and she discontinued them.   She did not have any numbness or weakness in her upper or lower extremities.   It was noted that she had not been employed for the last two years and there was a lawsuit regarding her injury related to her fall at Walmart.   She appeared neurologically intact with intact sensory examination to light touch and pinprick, deep tendon reflex test and motor strength test. She had multiple tender points along her cervical, thoracic and lumber spine.   Dr. Milcovic told the Plaintiff that he was glad she was off narcotics, and he would not suggest she use narcotics for this type of discomfort.   He started her on Baclofen and Topamax and wanted to see her back in three weeks. (Tr. 364–65).

On October 10, 2007, Dr. Carol Deatrick, a file-reviewing psychologist, completed a Psychiatric Review Technique ("PRT") form, at the request of SSA.   In reviewing the medical

12

evidence, the psychologist indicated the Plaintiff had 12.04 Affective Disorder (MDD) and 12.09 Substance Addiction Disorder.   The medical consultant found that the Plaintiff had mild difficulties in maintaining concentration, persistence, or pace, but had no other limitations. (Tr. 302–15).

On October 16, 2007, Plaintiff was admitted to Lee Mental Health Center for a psychiatric evaluation by Dr. Sall, M.D., via a Baker Act.   The Plaintiff was brought in by the police after assaulting an officer.   The Plaintiff said she had been swindled by a boyfriend, began to drink, and then called police to report the theft.   When the police arrived, Plaintiff was already intoxicated and said she intended to kill herself, though she was ultimately determined not to be a suicide risk. The Plaintiff tried to close the door on the policeman.   She had been an outpatient for the three months before this event due to depression, but she had discontinued her medication about a year prior. Plaintiff had been sober for four and a half years before this event, and she denied the use of street drugs.   A mental status examination indicated that the Plaintiff was bright, her judgment was good, memory for recent and remote events was unimpaired, immediate recall and concentration were within normal limits, and there was no evidence of hallucinations or delusions. Diagnosis was major depressive disorder, recurrent, mild by history; and borderline personality disorder.   The Plaintiff was assigned a GAF of 50.   She was discharged to the care of Randy Johnson, M.D. and was to continue taking Celexa and Klonopin. (Tr. 326–327).

In November 2007, the Plaintiff returned to Dr. Strausbaugh complaining of increasing pain from her fibromyalgia.   The Plaintiff said she had pain in her entire body and was not sleeping well.   He prescribed Lyrica. (Tr. 370).   She saw him again and said her vision was blurry; he again diagnosed fibromyalgia, and ruled out OSA.   He decreased the Lyrica to 25 mg.

(Tr. 369).   Later that month the Plaintiff returned with complaints of swollen legs and feet. Diagnosis was pedal edema; she was prescribed Lasix. (Tr. 368).

On July 1, 2008, the Plaintiff returned to Lee Memorial Health System with complaints of moderate to severe, constant pain all over after slipping in a water puddle the day before.   The Plaintiff had diffuse back pain, consistent with her normal scoliosis-type back pain.   There was full range of motion of all extremities; she was alert and oriented x 3, had distal strength and sensation intact in all four extremities; she had normal mood and affect and was stable throughout the emergency room course.   She felt much better with pain medications and expressed desire to go back into pain management, for which she was referred.   Her work up was otherwise negative, and she was discharged home with diagnoses of acute back pain and diffuse bilateral paresthesias. (Tr. 354–55).

The Plaintiff treated with Dr. Laura Morris, M.D., a board certified neurologist at First Choice Pain Care, beginning July 16, 2008.   Impressions were of spinal pain secondary to diastomatomyelia, s/p heel cord lengthening. Treatment included OxyContin and Roxicodone. (Tr. 433).   In her treatment notes, Dr. Morris reported tender points (Tr. 432), left foot numbness, moderate weak left leg, occasional hand/arm numbness, neck pain radiating down the arms/spine, total spine pain, scoliosis, anxiety secondary to pain, and a need for total knee replacement. (Tr. 431–33).   Dr. Morris noted Plaintiff was in Pain Management for 5 years but ran out of money; she noted Plaintiff wakes up with pain 3–4 times a night. (Tr. 431–33).   On August 13, 2008, the Plaintiff said that the Roxixodone was not working; she considered going on narcotics and thought the anticipated increase in quality of life was worth the potential side effects of medication. She said she did not abuse these drugs. (Tr. 430).   In September 2008, the Plaintiff reported bad night

sweats and having good and bad days, but she was definitely better and was walking more. (Tr. 428).

On September 25, 2008, Plaintiff returned to Dr. Strausbaugh for her chronic back pain (Tr. 366). On June 19, 2009, Plaintiff was diagnosed with hypertension and depression. (Tr. 440).

A progress note from Dr. Johnson on October 16, 2008, states the same findings as reported from her July 16, 2007, visit, except that the Plaintiff had mild or minimal symptoms of depression and anxiety, and she was alert and interested with euthymic mood and appropriate effect. (Tr. 412).   On October 20, 2008, Dr. Johnson completed a Mental Capacity Assessment form.   He checked that Plaintiff had marked limitations in social interaction, sustained concentration and persistence, and adaptation.   He concluded that she suffers from generalized anxiety and was currently on medication for same three times a day.   She had several medical conditions that caused chronic pain.   The doctor also indicated the condition was likely to deteriorate if she was placed under stress, particularly that of a job and was expected to last 12 months or more. (Tr. 408–13).

By November, the Plaintiff said she was tired all the time.   On November 4, 2008, Dr. Morris completed a Physical Capacity Evaluation form regarding the Plaintiff.   Dr. Morris checked the Plaintiff could stand/walk for 30 minutes at one time, and stand/walk for 1 hour total throughout the day in an 8-hour workday; the Plaintiff could sit for 1 hour at one time, 3 hours total throughout an 8-hour workday.   She said the Plaintiff could lift up to 10 pounds occasionally but could never bend, squat, crawl, or climb; the Plaintiff had not been able to work for more than two years. (Tr. 414–15). Dr. Morris also completed a pain interrogatory report, stating that Dr. Morris treated the Plaintiff for pain management for fibromyalgia and diastomatomyelia.   Her clinical

findings were based on x-rays, MRI of the spine, and exams, showing 14 out of 18 tender points. She said that CBC showed macroytic anemia and that exam and radiological findings supported the diagnoses. (Tr. 416).

The Plaintiff complained of a lot of pain on December 2, 2008. (Tr. 425).   Late December, Dr. Morris wrote that Plaintiff looked very tired; she had just come home that morning after spending one month in New Jersey, and she had a fibromyalgia flare up from the cold weather up North. (Tr. 424).   In January 2009, the Plaintiff said she was better with the increased Roxicodone; she was sleeping well.   The Plaintiff's medications were continued. (Tr. 423).

In February 2009, Dr. Morris noted progressive leg weakness and progressive arm/hand tingling.   The Plaintiff was living on charity from family and friends. (Tr. 422).   In March 2009, Dr. Morris noted widespread pain. (Tr. 421).   In April 2009, the Plaintiff reportedly had symptoms consistent with early bilateral trigger thumbs; she needed injections.   Dr. Morris wanted an MRI of the lumbar spine.   The Plaintiff had pain in the base of the neck that was still bothering her.   MRI of the lumbar spine done in April 2009 showed congenital deformities, endplate changes throughout the thoracic and lumbar spine, degenerative disc disease, bulging disc at L2/3; bulging disc at L4/5; and facet hypertrophy at L5/S1. (Tr. 420).

In May 2009, her treating doctors at First Choice Pain Care noted that Plaintiff did not want surgery on her back; the Plaintiff reported that her pain was well controlled on her current pain regimen. (Tr. 419).

By June 2009, the Plaintiff complained of bilateral hand pain; her hands were cool and the color was slightly red.   Dr. Morris, however, reported that she had not been taking her medication. The Plaintiff appeared to have vasospastic disease. (Tr. 418).

*Administrative Law Judge's Decision*

Upon consideration of the evidence, the ALJ found the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. (Tr. 12, Finding 1).   The ALJ found the Plaintiff had not engaged in substantial gainful activity since February 23, 2006, the alleged onset date (20 CFR §§ 404.1571 *et seq.*, and 416.971 *et seq.*). (Tr. 12, Finding 2).   The Plaintiff was found to have the following severe impairments: osteoarthritis right knee, spina bifida, fibromyalgia, and obesity (20 CFR §§ 404.1520(c) and 416.920(c)). (Tr. 12, Finding 3). However, the Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1525, 404.1526, 416.925 and 416.926). (Tr. 15, Finding 4).

After careful consideration of the entire record, the ALJ determined the Plaintiff has the residual functional capacity to perform the full range of medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c). (Tr. 15, Finding 5).   Further, the Plaintiff is capable of performing past relevant work as a nursing companion and home health aide.   This work does not require performance of work-related activities precluded by the Plaintiff's residual functional capacity (20 CFR §§ 404.1565 and 416.965). (Tr. 22, Finding 6).   Accordingly, the ALJ found that the Plaintiff had not been under a disability, as defined in the Social Security Act, from February 23, 2006, through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)). (Tr. 22, Finding 7).

## THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v.

Comm'r Soc. Sec., No. 6:06-cv-1749-Orl-DAB, 2007 U.S. Dist. LEXIS 91216, at *4–5 (M.D. Fla.

Dec. 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842

(1971)); McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988)). In evaluating whether a

claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations.[1] 20

C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if

supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a

scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact,

and must include such relevant evidence as a reasonable person would accept as adequate to

support the conclusion." Hibbard, 2007 U.S. Dist. LEXIS 91216, *5 (citing Foote v. Chater, 67

F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.3d 835, 838 (11th Cir.

1982)); Richardson, 402 U.S. at 401.

---

[1]

The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or
mandate a finding of disability. The steps are as follows:

*Step 1*. Is the claimant engaged in substantial gainful activity? If the claimant is engage in
such activity, then he or she is not disabled.  If not then the ALJ must move on to the next
question.

*Step 2*. Does the claimant suffer from a severe impairment? If not, then the claimant is not
disabled.   If there is a sever impairment, the ALJ moved on to step three.

*Step 3*. Does the claimant's impairment meet or equal one of the listed impairments set
forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.   If so, then the claimant is disabled. If not, the
next question must be resolved.

*Step 4*. Can the claimant perform his or her former work? If the claimant can perform his or
her past relevant work he or she is not disabled.   If not, the ALJ must answer the last question.

*Step 5*. Can he or she engage in other work of the sort found in the national economy?   If
so, then the claimant is not disabled.   If the claimant cannot engage in other work, then he or she is
disables. See 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f); see also Philips v. Barnhart, 357 F.3d
1232, 1237–40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per
curiam).

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Philips v. Barnhart, 357 F. 3d 1232, 1240 n.8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [Commissioner]." Phillips, 357 F.3d at 1240 n.8; Dyer v. Barnhart, 357 F.3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g) (Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Comm'r Soc. Sec., 407 F. Supp. 2d 1297, 1299–1300 (M.D. Fla. 2005) (citing Keeton v. Dep't of Health & Hum. Serv., 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.3d 1143, 1145 (11th Cir. 1991).

## DISCUSSION

The law qualifies a person as disabled, and, thus, eligible for disability insurance benefits and Supplemental Security Income pursuant to the Social Security Act, only if he or she is unable to do any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, such that the claimant is not only unable to do his or her previous work, but also cannot engage in any other substantial gainful activity which exists in the national economy when considering his or her age, education, and work experience. Barnhart v. Thomas, 540 U.S. 20, 21 (2003) (citing 42 U.S.C. § 423(d)(2)(A)); 20 C.F.R. §§ 404.1505−404.1511.

The Plaintiff alleges that the ALJ committed the following errors for which this case should be remanded: (1) the ALJ's assessment of the Plaintiff's residual functional capacity (hereinafter RFC) was not supported by substantial evidence; and (2) the ALJ erred by not eliciting Vocational Expert (hereinafter VE) testimony, and, instead, relying exclusively on the medical-vocational guidelines. (Doc. #12, p. 15, 19). Conversely, the Commissioner argues the ALJ's RFC determination is supported by substantial evidence, and the testimony of a VE was not required. (Doc. #14, p. 4, 11). The Court will examine each point of error alleged by the Plaintiff, respectively.

### *Whether the ALJ's Assessment of Plaintiff's RFC was Supported by Substantial Evidence*

The Plaintiff states that substantial evidence does not support the ALJ's determination that the Plaintiff has the RFC to perform the full range of medium work.   Specifically, the Plaintiff contends that in assessing the Plaintiff's RFC, the ALJ ignored all the medical evidence. (Doc. #12, p. 17).

The fourth step in the evaluation process requires the ALJ to assess the plaintiff's RFC, which is defined as that which an individual is still able to do despite the limitations caused by his or her impairments. Phillips, 375 F.3d at 1238.   In making this finding, the ALJ must consider all

of the claimant's impairments, including impairments that are not severe. Kinnard v. Astrue, No. 8:09-cv-628-T-24AEP, 2010 U.S. Dist. LEXIS 94563, at *42 (M.D. Fla. Aug. 26, 2010); 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), and 416.945; S.S.R. 96–8p.   The determination of RFC is within the authority of the ALJ, and, based on that assessment, along with the claimant's age, education, and work experience, the ALJ must decide whether the plaintiff is able to return to his or her previous work, or, if not, to any other type of work available in the national economy. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); Lewis, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1520(f)).   That is, the ALJ must determine if the claimant is limited to a particular work level. Id. (citing 20 C.F.R. § 404.1567).

The RFC assessment is based upon all relevant medical and other evidence in the case record of a claimant's remaining ability to do work despite her impairments. Phillips, 357 F.3d at 1238; Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)).   Specifically, consideration will be given to statements provided by medical sources, whether or not they are based on formal medical examinations, and descriptions and observations of the plaintiff's limitations from his or her impairment(s) provided by the plaintiff, his or her family, or other persons. 20 C.F.R. § 404.1545(a)(3).   An assessment of the plaintiff's RFC should take into account his or her physical and mental limitations, 20 C.F.R. § 404.1545(a)(1), as well as the plaintiffs ability to meet the physical, mental, and other demands of work. 20 C.F.R. § 404.1545(a)(4).   The Plaintiff maintains the ALJ's RFC finding was not supported by the record because the ALJ ignored all the medical evidence by: (a) discounting the opinion evidence of medical experts, (b) erroneously substituting his opinion for that of a medical expert, and (c) discounting the Plaintiff's fibromyalgia and pain complaints. (Doc. #12, pp. 16–18).

21

### a. Whether the ALJ Properly Discounted the Opinion Evidence of Medical Experts

With regard to the Plaintiff's first contention, the Plaintiff alleges the ALJ improperly discounted the opinion evidence of medical experts who determined that pain and functional limitations, as well as mental limitations due to depression, affected the Plaintiff's RFC. (Doc. #12, p. 16–17).   The Plaintiff notes that she has diagnosed right knee impairments, possibly requiring total knee replacement, spina bifida with severe scoliosis in the spine, and fibromyalgia.   For years, the Plaintiff's treating physicians have noted her pain and prescribed pain medication accordingly.   The Plaintiff points to evidence in the record in an attempt to show that no doctor has found the Plaintiff capable of a full range of medium work, including Dr. Morris, Dr. Deasai, and Arlene Sumner.

The Plaintiff suggests that the opinion of Dr. Morris, a treating source, demonstrates that she is unable to perform medium work.   Dr. Morris completed a Pain Interrogatory Report and a Physical Capacity evaluation, reporting that she had provided pain management to Plaintiff and noting the Plaintiff's pain due to her fibromyalgia.   Additionally, Dr. Morris reported that functional limitations would prevent the Plaintiff from performing even sedentary levels[2] of exertion. (Doc. #12, 16–17).

Similarly, the non-examining state agency reviewers, Dr. Desai and Arlene Sumner, each conducted a Physical RFC assessment limiting the Plaintiff to light work.   They also found that

---

[2] According to 20 C.F.R. § 404.1567(a), "sedentary work" is defined as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.   Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.   Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

the Plaintiff demonstrated postural limitations, possessing the capability to only occasionally climb, balance, stop, kneel, crouch, and crawl.   Dr. Desai further limited the Plaintiff's RFC to: never climbing ladders or ropes, never kneeling, and never crawling, and avoiding concentrated exposure to extreme cold, humidity, vibration, and hazards.   The state agency reviewers limited the Plaintiff to lifting only up to 20 pounds; whereas, the ALJ, by finding the Plaintiff capable of medium work, determined she could lift up to 50 pounds.   Essentially, Dr. Morris and the state agency reviewers found the Plaintiff more limited than did the ALJ. (Doc. #12, 17–18).

Lastly, the Plaintiff implies that her depression affected her ability to work by noting that, according to Dr. Johnson who is a treating psychiatrist, the Plaintiff's condition was likely to deteriorate if she was placed under stress, particularly that of a job. (Doc. #12, p. 16).

After careful consideration of the entire record, the ALJ determined the Plaintiff had the RFC to perform the full range of medium work.[3]   An ALJ is required to evaluate every medical opinion he receives, regardless of its source. 20 C.F.R. § 404.1527(d).   The ALJ must "state with particularity the weight he accorded different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987).   Failure of the ALJ to do so is reversible error. Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987).

Substantial or considerable weight must be given to the opinion of a treating physician unless good cause is shown to the contrary. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2003) (citation Lewis v. Calhahan, 125 F.3d 1436, 1430–41 (11th Cir. 1997)); see Sabo v. Chater,

---

[3] Pursuant to 20 C.F.R. § 404.1567(c), "medium work" is that which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.   If someone can do medium work, we determine that that he or she can also do sedentary and light work."

955 F. Supp. 1456, 1462 (M.D. Fla. 1996) ("Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician ..."); 20 C.F.R. § 404.1527 (d).   "'Good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1240. Should the ALJ disregard the opinion of a treating physician, the ALJ must clearly articulate the reasons, therefore, failure to do so is reversible error. Lewis, 125 F.3d at 1440.

If a treating physician's opinion does not warrant controlling weight, the ALJ must consider the following factors in deciding the proper weight of any medical opinion: (1) the examining relationship, (2) the length of the treatment relationship and the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the medical evidence supporting the opinion, (5) consistency with the record as a whole, (7) specialization in the medical issues at issue, and (8) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

The opinion evidence of a treating physician is generally entitled to more weight than that of a consulting physician. Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984) (citation omitted).   A consulting physician is an examining physician. See 20 C.F.R. § 220.46(d) ("A consulting physician is a doctor (often a specialist) to whom the claimant is referred for an examination ...").   Although a consultative examination is not to be given greater weight than a treating doctor, the ALJ's decision has been upheld where good cause was shown for doing so. See Fries v. Comm'r of Soc. Sec. Admin., 196 Fed. Appx. 827, 833 (11th Cir. 2006); Gholston v. Barnhart, 347 F. Supp. 2d 1108, 1114 (M.D. Ala. 2003).   However, the report of a one-time

examination conducted by a consulting physician "does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." <u>Kent v. Sullivan</u>, 788 F. Supp. 541, 544 (N.D. Ala. 1992).   Therefore, a one-time examiner's opinion is not entitled to deference. <u>McSwain v. Bowen</u>, 814 F.2d 617, 619 (11th Cir. 1987) (citation omitted).

Furthermore, the opinion of a non-examining physician does not satisfy the good cause requirement needed to reject a contrary opinion of a treating physician. <u>Lamb v. Bowen</u>, 847 F.2d 698, 703 (11th Cir. 1988).   The opinion of a non-examining reviewing physician is entitled to little weight, and, taken alone, does not constitute substantial evidence on which to base an administrative decision. <u>Swindle v. Sullivan</u>, 914 F.2d 222, 226 n.3 (11th Cir. 1990); <u>see</u> <u>Spencer ex rel. Spencer v. Heckler</u>, 765 F.2d 1090, 1094 (11th Cir. 1985) ("[T]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at its best.") (citations omitted).

Similar to a treating physician, an examining physician's opinion is generally given more weight than a non-examining reviewing physician. <u>Shaw</u>, 2010 U.S. App. LEXIS 16720 at *5 (citing 20 C.F.R. § 404.1527(d)(1)); <u>Broughton v. Heckler</u>, 776 F.2d 960, 961 (11th Cir. 1985). Little weight is accorded to the opinions of a non-examining reviewing doctor when it is contrary to that of an examining physician. <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279-80 (11th Cir. 1987). <u>See</u> <u>Sryock v. Heckler</u>, 764 F.2d 834, 835 (11th Cir. 1985) (finding that the ALJ may reject *any* medical opinion if the evidence supports a contrary finding).

The ALJ is required to review all of the medical findings and other evidence that supports a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

In making his finding in this case, the ALJ reviewed all of the relevant evidence, including all symptoms, objective medical evidence, and opinion evidence offered by the Plaintiff's treating and examining physicians. (Tr. 15).   The ALJ properly discounted the opinion evidence, according no weight to that of Dr. Morris and Dr. Johnson and assigning only partial weight to that of Dr. Desai. (Tr. 14, 21).   The ALJ found the functional limitations reported by Dr. Morris—the Plaintiff's inability to walk or stand for more than one hour a day or sit for more than three hours a day—to be inconsistent with the other evidence in the record and unsupported by the doctor's own progress notes. (Tr. 21).

Alternatively, the ALJ accorded Dr. Desai's opinion of the Plaintiff's exertional limitations partial weight.   The ALJ found the physician's determination of the Plaintiff's capabilities to stand/walk and sit deserving of great weight as consistent with the evidence; however, based on the record, the ALJ found the Plaintiff has a greater lifting ability than did Dr. Desai, and she had no postural or environmental limitations. (Tr. 21).   Thus, based upon the ALJ's review of the opinion evidence, the ALJ supported his RFC determination with substantial evidence from the record.

The findings of Dr. Morris and Dr. Desai regarding the Plaintiff's functional and exertional limitations are inconsistent with the evidence of record.   The ALJ observed that there was no indication that the Plaintiff was restricted from any activities.   Specifically, the ALJ stated:

> Despite her allegations of total and complete disability with such severe pain and right knee problems that she could not even complete self care activities at times, the evidence shows that she was able to take care of herself and complete activities of daily living, watch television, drive a manual transmission truck, do light household chores, cook, shop and travel out of state.

(Tr. 21).

Nor was inpatient hospitalization ever recommended.   As stated by the ALJ, despite the Plaintiff's diagnosed fibromyalgia in 2003, Dr. Free's treatment records from March 2006 through January 2007 reported that her fibromyalgia was stable and she was doing well on her medications. (Tr. 16, 20, 192, 218, 221, 225, 230, 233, 236, 240).   Although the Plaintiff suffered a knee injury in January 2005, it was treated with injections while she was working. (Tr. 16, 203, 208, 210).   As the ALJ discussed, the Plaintiff characterized her knee pain as moderate and reported the injections provided good pain relief, and she did not use an assistive device. (Tr. 17, 221).   The Plaintiff's medical records from 2005 through 2006 show a history of chronic pain complaints; however, it was reported that she did well on Oxycontin. (Tr. 231, 236, 240, 246, 253).   Additionally, despite these impairments, the Plaintiff continued to work or seek employment through most of 2006.

The ALJ discussed that in April 2007, a form completed by Orthopedic Specialists described the Plaintiff as having a mild antalgic right leg, but had 5/5 muscle strength and could squat, walk on toes and heels, and an assistive device was not medically necessary for ambulation. (Tr. 17, 20, 265).   In May 2007, Dr. Zsigmond reported the Plaintiff had good basic functionality and no prominent gait or gross motor coordination abnormalities. (Tr. 21, 266–69).   Similarly, in

September 2007, consultative physician Dr. Milcovic indicated that, despite her history of congenital spina bifida and her chronic pain complaints, an examination revealed she was a full-functioning individual for most of her life, and she did not have any numbness or weakness in her upper or lower extremities. (Tr. 18, 21, 364–65).  The Plaintiff continued to complain of chronic pain; however, as the ALJ points out, in May 2009, she reported that her current pain regimen kept her pain well controlled. (Tr. 21, 419, 424).   Thus, the Plaintiff failed to prove that the ALJ's RFC assessment was not based upon substantial evidence. See Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) (finding that even if the record could support an alternative RFC, when based upon substantial evidence, the ALJ's decision will not be disturbed).

Lastly, Dr. Johnson's October 20, 2008, RFC assessment was not given any weight as it was inconsistent with the other evidence of record and was in direct contradiction to his prior examination findings and his own progress notes on October 16, 2008. (Tr. 14).   The ALJ determined that, although the Plaintiff has a history of substance abuse and treatment for depression, her mental impairment of depression caused only a minimal limitation on her ability to perform basic mental activities and, thus, was not severe.[4] (Tr. 14).

In 2007, the Plaintiff was seen by Dr. Zsigmond, Dr. Johnson, and Dr. Sall, all of whom reported that the Plaintiff's memory for recent and remote events was unimpaired and

---

[4] A non-severe impairment is a "'slight abnormality' that has 'such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" Salazar v. Comm'r of Soc. Sec., 372 Fed. Appx. 64, 66 (11th Cir. 2010) (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).   A diagnosis alone does not demonstrate the presence of a severe impairment. See, e.g., Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

concentration was within normal limits.   Furthermore, Dr. Zsigmond indicated the Plaintiff was alert and well oriented, with no symptoms of psychosis, her speech and thought processes were logical and coherent, and she was able to initiate and maintain friendships.   Similarly, according to Dr. Johnson, her conceptual disorganization was insignificant, her thought content was not significantly preoccupied, and her attitude was cooperative.   Dr. Johnson and Sall found no evidence of hallucinations, and that the Plaintiff's judgment was good.   Diagnosis by all three doctors was major depressive disorder, recurrent, though they differed on the degree of impairment with Dr. Johnson opining that it was severe and the other two doctors indicating that it was not severe.[5] (Tr. 13, 298–99, 326–27).

These findings are largely substantiated by Dr. Johnson's progress note on October 16, 2008, which is almost identical to her prior report, except that the progress note indicated mild or minimal symptoms in regard to the Plaintiff's depressive disorder, representing an improvement. However, the progress notes were contradicted just four days later, on October 20, 2008, when Dr. Johnson completed a RFC assessment indicating generalized anxiety with marked limitations in the following: social interaction, concentration and persistence, and adaptation.

Clearly, the ALJ did not improperly discount the opinion evidence, but, rather, considered the medical record as a whole.   The opinion of non-examining physician, Dr. Desai, was assigned partial weight only to the extent it was not consistent with the other evidence. See Swindle, 914, F.2d at 226 n.3 (entitling the opinion of a non-examining physician little weight).

---

[5] Dr. Zsigmond diagnosed major depressive disorder, recurrent, moderate, whereas Dr. Sall indicated that the disorder was mild.

Furthermore, in regard to the opinion of Arlene Sumner, not only was she a non-examining reviewer, but there is no indication this person is a medical professional.   Although Dr. Morris and Dr. Johnson were treating physicians, and, thus, their opinions are generally entitled to considerable weight, good cause was shown for discounting their findings; Dr. Morris' opinions were not bolstered by her own progress notes and were inconsistent with the other medical and opinion evidence by both treating and examining physicians.   Similarly, evidence submitted by examining and non-examining physicians supported a contrary finding to that of Dr. Johnson.

Additionally, Dr. Johnson's October 20, 2008 findings, those upon which the Plaintiff relies, are inconsistent with his own medical records just four days prior.   The ALJ is required to evaluate every medical opinion he receives. 20 C.F.R. § 404.1527(d).   The ALJ clearly articulated the weight accorded to the opinion evidence and gave sufficient reasons that were supported by substantial evidence for disregarding the findings of Dr. Morris, Dr. Desai, and Dr. Johnson. When the ALJ has articulated specific reasons for not giving a physician's opinion controlling weight and those reasons are supported by substantial evidence, there is no reversible error. Schardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008) (citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)). Accordingly, it was no error for the ALJ to discount the opinions of these three doctors.

### b. Whether the ALJ Substituted his Opinion for that of a Medical Expert

Next, the Plaintiff presents a second, but related, argument, namely that the ALJ substituted his own opinion for that of a medical expert, which is legal error. (Doc. #12, p. 18–19). The ALJ may not substitute his judgment of the claimant's condition for that of a medical expert. Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).   In other words, a medical diagnosis

may not be arbitrarily replaced by the ALJ's own hunch or intuition; he cannot act as both judge and physician. <u>Marbury v. Sullivan</u>, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring) (finding that the ALJ erroneously allowed his personal views regarding the non-physical source of plaintiff's seizure disorder to interfere with his legal administrative responsibilities); <u>see, e.g.</u>, <u>Hillsman v. Bowen</u>, 804 F.2d 1179, 1182 (11th Cir. 1986) (holding that the ALJ may not reject the opinion of a treating physician, simply because he reached a different conclusion after review of the medical records). <u>See also</u> <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1081 (11th Cir. 1988) (finding that it is error for the ALJ to comment regarding the fact that a claimant does not appear in pain at the hearing); <u>but see</u> <u>Long v. Shalala</u>, 902 F. Supp. 1544, 1547 (M.D. Fla. 1995) (noting that the ALJ can consider "appearance and demeanor" of the claimant during the hearing as long as it is not exclusively relied upon).

The Plaintiff contends that the ALJ is not a physician, but erroneously acted as both judge and physician by basing his determination that the Plaintiff was capable of medium work on his own medical assessment of the evidence.   The Plaintiff concludes that, in finding the Plaintiff more capable than did the physicians, the ALJ is making his own independent conclusion since there is no opinion evidence of record that the Plaintiff can perform medium work.   The Plaintiff notes that the state agency physician, based upon review of the medical record, limited the Plaintiff to light work coupled with additional postural and environmental limitations. (Doc. #12, p. 19). Nevertheless, the Court concludes that the ALJ properly relied on the medical evidence in making his determination that the Plaintiff was capable of medium work.

Here, the ALJ discounted the opinion evidence of three medical experts, Dr. Johnson, Dr. Morris, and Dr. Desai; however, he did not do so based upon a mere difference of opinion, nor did

he allow his personal views to influence his determination.   Rather, the ALJ had good cause to discount the opinions of a few physicians because they either conflicted with the other medical evidence of record or with their own reports, as already discussed.   Furthermore, the ALJ did not exclusively rely upon the Plaintiff's appearance and demeanor at the hearing, but rather based his opinion on the evidence of record which substantiates his conclusion, again, as mentioned above.

   c. *Whether the ALJ Failed to Properly Evaluate Plaintiff's Fibromyalgia and Pain*

   Third, the Plaintiff alleges that the ALJ committed error by discounting the Plaintiff's fibromyalgia and pain complaints, stating they are "out of proportion to the objective findings." She argues, essentially, the ALJ misapplied the pain standard by requiring objective medical evidence of the Plaintiff's complaint of pain due to her fibromyalgia. (Doc. #12, p.18).

   Here, the Plaintiff maintains that she has diagnosed fibromyalgia, along with other diagnosed impairments; her treating physicians have noted her pain and have prescribed pain medication. (Doc. #12, p. 17–18).   However, because the courts have recognized that fibromyalgia often lacks medical or laboratory signs, which may cause the record to be lacking in objective evidence of the impairment, it was legal error for the ALJ to rely on this lack of objective medical evidence. (Doc. #12, p. 18).

   Pain is a non-exertional impairment. Phillips v. Barnhart, 357 F.3d 1232, 1243 n.11 (11th Cir. 2004).   Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g. medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A).   The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms

can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged and other symptoms, the ALJ must apply the Eleventh Circuit's three-part "pain standard." Foote, 67 F.3d at 1560.

In order to establish disability based on testimony of pain or other subjective symptoms, the claimant carries the burden of satisfying two parts of a three-part pain standard requiring: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002); Jones v. Dep't of Health and Hum. Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

In this case, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity.

(Tr. 20). Ultimately, the ALJ determined that the Plaintiff's impairments were not severe enough or so disabling to render her unable to work. (Tr. 21).

The Plaintiff alleges chronic pain, precluding her from work and even self-care activity at times.   The ALJ discounts this, however, by stating that she conceded that the reason she stopped working was because she was let go, not because of her pain.   Additionally, upon being let go, she filed for unemployment, indicating an ability and intention to work. (Tr. 20).

A claimant's application for unemployment compensation benefits adversely affect his credibility since such an application requires one to hold himself out as available, willing, and able to work. Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1997).   Therefore, by applying for unemployment compensation benefits, a claimant necessarily indicates that he is able to do work; this is some evidence, though not conclusive, to negate the claimant's allegation that he was disabled during that time. Id.; see Johnson v. Charter, 108 F.3d 178, 180 (8th Cir. 1997).

The ALJ further added that, from a physical perspective, it appeared the Plaintiff's "reports of pain and limitations are out of proportion to the objective findings." (Tr. 20).   The evidence of record reflects that the Plaintiff's fibromyalgia was stable in March 2006 as she was doing well on her medications according to her treating source; she was an alcoholic and was employed part time as a CNA; in 2006, Dr. Free reported that the Plaintiff tested positive for methadone, cocaine, and oxycodone and would no longer prescribe her pain medications; in 2007, she had 5/5 muscle

34

strength, was mildly antalgic, could squat, and an assistive device was not medically necessary; that same year Dr. Zsigmond indicated she had good basic functioning and no prominent gait abnormalities or gross motor coordination problems; Dr. Milcovic reported she was a fully-functioning individual for most her life despite her spina bifida; later in 2007, she returned to drinking; and in 2009, she stated her pain was well controlled by her current pain regimen. (Tr. 20–21).

Lastly, the ALJ notes the Plaintiff's activities contradicted her allegations of severe pain. The evidence shows the Plaintiff was able to take care of herself and complete daily living activities such as meal preparation and light household chores.  She was able to pay bills and handle accounts, drive a manual truck, go grocery shopping once a week, and travel out of state. (Tr. 21).

While the performance of everyday tasks cannot be used to make a determination that the Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in regard to his ability to perform certain tasks. See Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise). See Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination).

The Court finds the ALJ properly assessed the Plaintiff's credibility and non-exertional impairment of pain.  The Court recognizes the Plaintiff relies heavily on the Eleventh Circuit's

decision in <u>Stewart v. Apfel</u>, which found that medical research revealed because the hallmark of fibromyalgia is a lack of objective medical or laboratory evidence, and is generally diagnosed on an individual's described symptoms. No. 99-6132, 245 F.3d 793, 2000 U.S. App. LEXIS 33214 (11th Cir. Dec. 20, 2000) (reversing the ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment). Although the court's decision was affirmed in <u>Moore v. Barnhart</u>, it was distinguished from <u>Stewart</u> in that the ALJ relied not on a lack of objective evidence for his own negative credibility determination, but on the inconsistencies between the claimant's descriptions of her daily activities and her claims of infirmity. 405 F. 3d 1208, 1212 (11th Cir. 2005) (holding <u>Stewart</u> was unavailing since ALJ provided a detailed factual basis for his credibility determination that "did not turn on the lack of objective evidence documenting fibromyalgia").

Like <u>Moore</u>, the ALJ did not rely on a lack of objective evidence in discounting the Plaintiff's complaints of pain due to fibromyalgia as the Plaintiff alleges; rather, the ALJ relied upon the lack of proportionality between the Plaintiff's pain complaints and the objective evidence, as well as inconsistencies in the Plaintiff's own statements and actions.

The ALJ reviewed the objective medical evidence from the treating and other physicians, as well as other factors such as application of unemployment compensation benefits, her reason for leaving work, evidence of daily activities, and the frequency and intensity of pain and precipitating and aggravating factors.   In his decision, the ALJ provided a detailed rationale substantiated by evidence of the record to support his credibility determination.   The ALJ stated in pertinent part:

> From a physical perspective, it appears that the claimant's reports of pain and limitations are out of proportion to the objective findings.   The evidence reflects that her fibromyalgia was stable in March 2006, according to her treating source,

and she was doing well on her medications.  It was noted that the claimant was a recovering alcoholic and was employed part time as a CNA . . . . The Record indicates that she continued to take narcotic pain medication, prescribed by various sources.  After she hurt her right knee, in June 2006, injections and arthoscopy were recommended . . . .  In October 2006, Dr. Free reported that a drug screening was positive for methadone, cocaine and oxycidone and he would no longer prescribe pain medications for the claimant . . . .  In April 2007 she had 5/5 strength, was mildly antalgic, could squat and an assistive device was not medically necessary. . . .

In May 2007, Dr. Zsigmond indicated that she has a good basic functioning and no prominent gait abnormalities or gross motor coordination problems. . . . Dr. Milcovic, in September 2007 said that despite her history of spina bifida, she did quite well and function-wise, she was a fully-functioning individual for all three years . . . . The claimant continued to complain of pain to Dr. Morris for a month in December 2008. . . . In May 2009, she reported that her pain was well controlled on her current pain regimen.

(Tr. 20-21).

Therefore, the ALJ did not err in discounting the Plaintiff's fibromyalgia and pain complaints, as there is substantial evidence to support the ALJ's finding. Accordingly, the ALJ's assessment of the Plaintiff's RFC was supported by substantial evidence.

### Whether the ALJ Erred by Not Eliciting a Vocational Expert

Finally, the Plaintiff argues that the ALJ erred by not obtaining vocational expert (hereinafter VE) testimony since the Plaintiff had the impairment of pain, and, instead, relies exclusively on the medical-vocational guidelines to make the determination that she was not disabled. (Doc. #12, p. 19).   Once it is determined the claimant cannot return to his previous work, the ALJ's obligation of developing a full and fair record of the existence of vocational opportunities available to the claimant may sometimes be met through exclusive reliance on the Grids, which are applicable under certain conditions. Foote, 67 F.3d at 1558–59.   The claimant

must suffer from exertional impairments,[6] without significant non-exertional factors. Id. at 1559 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200(e)).   In cases where non-exertional impairments are alleged, "the ALJ may use Medical-Vocational Guidelines as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that the claimant can perform." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (citation omitted).   When the plaintiff's non-exertional limitations significantly impair basic work activities, or when the claimant's exertional limitations prevent the claimant from performing a full range of employment at the given level of exertion, the ALJ is required to consult with a VE; that is, exclusive reliance on the Grids would be improper in either instance. Phillips v. Barnhart, 357 F.3d 1232, 1242–43 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) (citing Foote, 67 F.3d at 1553, 1559).

The Plaintiff argues: (a) the Plaintiff's non-exertional impairments significantly limit her basic work skills, and (b) she is unable to perform the full, unlimited range of employment at the medium work level, both of which are conditions triggering the requirement of VE testimony. (Doc. #12, p. 19–20).   In support of her contentions, the Plaintiff points to the ALJ's finding that the Plaintiff's osteoarthritis of the right knee, spina bifida, fibromyalgia, and obesity were severe impairments, as well as to the evidence of record, which includes reports of pain and depression from her treating physicians.   In regard to the depression diagnosis, the Plaintiff further notes that she was Baker Acted in 2007, and her treating psychologist opined that she had marked mental

---

[6] Exertional impairments are "impairments which place limits on an individual's ability to meet job strength requirements." Foote, 67 F.3d at 1559 (citing Heckler v. Campbell, 461 U.S. 458 (1983)).

limitations needed in a work setting.   Lastly, the Plaintiff notes evidence of the record indicating the Plaintiff's postural and environmental limitations. (Doc. #12, p. 20).   Nevertheless, despite the evidence of record, VE testimony was unnecessary.

In the instant case, the ALJ determined that the Plaintiff's RFC was such that she was capable of performing her past relevant work as a nursing companion and home health aide. (Tr. 22).   The ALJ noted that   "[s]ince the undersigned is bound by the objective medical evidence, the undersigned finds that the claimant's impairments are not severe enough or so disabling to render her unable to work. (Tr. 21).   Further, the ALJ properly discredited any medical opinions that disagreed with his assessment that the Plaintiff could return to her passed relevant work. Thus, the ALJ found that the Plaintiff's claims that she was unable to perform her past work was not in agreement with the medical evidence in the record.

Generally, VE testimony is not necessary to determine whether a claimant can perform past relevant work. Fries v. Comm'r of Soc. Sec. Admin., 196 Fed. Appx 827, 832 (11th Cir. 2006); Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990).   Therefore, because the ALJ concluded the Plaintiff was capable of performing her past relevant work, testimony from a VE was not necessary.   The ALJ's decision should not be disturbed.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**   The decision of the Commissioner should be **AFFIRMED**.

Failure to file written objections to the proposed finding and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

      **RESPECTFULLY   RECOMMEDNED**   at   Fort   Myers,   Florida,   this   <u>27th</u>   day   of

December, 2010.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record